**SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.**

[209 N.C. App. 474 (2011)]

SPEEDWAY MOTORSPORTS INTERNATIONAL LTD., Plaintiff v. BRONWEN ENERGY TRADING, LTD., BRONWEN ENERGY TRADING UK, LTD., DR. PATRICK DENYEFA NDIOMU, BNP PARIBAS (SUISSE) SA, BNP PARIBAS S.A., SWIFT AVIATION GROUP, INC., SWIFT AIR, LLC, SWIFT AVIATION GROUP, LLC, AND SWIFT TRANSPORTATION CO., INC., Defendants

No. COA09-1451

(Filed 15 February 2011)

**1. Appeal and Error— interlocutory orders and appeals— denial of motion to dismiss—personal jurisdiction**

Although defendant Swiss Bank appealed from an interlocutory order denying its motion to dismiss for lack of personal jurisdiction, defendant was entitled to immediate appellate review under N.C.G.S. § 1-277(b).

**2. Jurisdiction— personal—incorporation by reference clause —forum selection clause**

The trial court erred by denying defendant Swiss Bank's motion to dismiss based on lack of personal jurisdiction. The "incorporation by reference" clause in plaintiff's agreement with defendant could not reasonably be constructed as subjecting defendant to the forum selection clause when it was intended to identify the contracts that were the subject of the demand guarantee being issued by defendant for plaintiff.

**3. Jurisdiction— personal—long arm statute—minimum contacts—due process**

The trial court did not have personal jurisdiction over defendant Swiss Bank under the North Carolina long arm statute when there were insufficient minimum contacts, and thus, there was no need to address whether exercising jurisdiction over defendant would satisfy the requirements of due process under the Fourteenth Amendment.

Appeal by defendant from order entered 14 July 2009 by Judge Albert Diaz in Mecklenburg County Superior Court. Heard in the Court of Appeals 14 April 2010.

*Parker Poe Adams & Bernstein LLP, by Michael G. Adams and William L. Esser IV, for plaintiff-appellee.*

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 474 (2011)]

*Winston & Strawn LLP, by Nash E. Long, III and Valerie B. Mullican, for defendant-appellant BNP Paribas (Suisse) SA.*

GEER, Judge.

Defendant BNP Paribas (Suisse) SA ("BNPP Suisse"), a Swiss bank, appeals from an order denying its motion to dismiss the claims of Speedway Motorsports International Ltd. ("SMIL") against BNPP Suisse for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Rules of Civil Procedure. In arguing that jurisdiction does exist, SMIL first contends that BNPP Suisse is bound by the North Carolina forum selection clause in SMIL's contracts with third parties because those contracts were incorporated by reference into SMIL's agreement with BNPP Suisse. We hold that the "incorporation by reference" clause in SMIL's agreement with BNPP Suisse cannot reasonably be construed as subjecting BNPP Suisse to the forum selection clause. Instead, the "incorporation by reference" clause was intended simply to identify the contracts that were the subject of the demand guarantee being issued by BNPP Suisse for SMIL.

In the absence of a forum selection clause, SMIL was required to establish that its claims against BNPP Suisse fell within one of the provisions of North Carolina's long-arm statute and that BNPP Suisse had sufficient minimum contacts with North Carolina. SMIL's evidence is not, however, sufficient to bring BNPP Suisse within the scope of the long-arm statute. We, therefore, reverse the trial court's order denying BNPP Suisse's motion to dismiss.

<u>Facts</u>

In 2006, SMIL, which is "in the business of petroleum products transactions," opened an account with BNPP Suisse to conduct that business. This case arises out of SMIL's use of its BNPP Suisse account in connection with a series of contracts pursuant to which SMIL agreed to guarantee lines of credit issued to finance petroleum purchases by other parties during 2007.

In early 2007, defendants Swift Aviation Group, Inc., Swift Air, LLC, Swift Aviation Group, LLC, and Swift Transportation Co., Inc. (collectively "Swift") were attempting to negotiate a long-term supply contract with Kuwait Petroleum Corporation ("KPC") pursuant to which Swift would purchase petroleum products from KPC. KPC was not, however, willing to enter into a long-term business relationship with Swift until Swift had proven its ability to successfully execute shorter-term spot contracts.

Upon the advice of BNP Paribas S.A. ("BNPP France"), a French bank of which BNPP Suisse is a subsidiary, Swift engaged defendants Bronwen Energy Trading, Ltd. and Bronwen Energy Trading UK, Ltd. (collectively "Bronwen") to assist Swift in executing the spot contracts with KPC. SMIL, which is headquartered in Charlotte, North Carolina, agreed to provide Bronwen with the financial assistance needed to obtain letters of credit for the purchase of the oil under the spot contracts.

On 12 July 2007, Bronwen and SMIL entered into an agreement relating to the delivery of 80,000 metric tons of Jet A-1 ("the First Oil Contract"). Under the First Oil Contract, SMIL agreed to provide BNPP France with a guarantee of $12,750,000.00 to allow Bronwen to secure from BNPP France one or more letters of credit to effectuate the purchase of the Jet A-1 from KPC. SMIL and Bronwen also agreed: "The funded amount guaranteed will be maintained in SMIL's account with [BNPP Suisse]. SMIL will execute such document(s) as reasonably required by [BNPP France] to effectuate the guarantee of the funded amount." The First Oil Contract further provided: "All litigation arising from or related to this agreement shall be heard exclusive [sic] in the state or federal courts sitting in Mecklenburg County, North Carolina, USA. Bronwen hereby irrevocably consents to personal jurisdiction [in] such courts."

To fulfill its obligations under the First Oil Contract, SMIL executed a guarantee ("the Corporate Guarantee") to BNPP France later that day. The next day, 13 July 2007, SMIL's president, William R. Brooks, also emailed the Corporate Guarantee to BNPP Suisse. BNPP France rejected as insufficient SMIL's Corporate Guarantee on 13 July 2007 and requested that SMIL instead issue instructions to BNPP Suisse to deliver a first demand guarantee to BNPP France. BNPP Suisse also emailed SMIL regarding the Corporate Guarantee and explained:

> Thanks for sending your corporate guarantee, but this is not what we need.
>
> What we actually need is your formal request to us, asking us to issue subject first demand guarantee on your behalf in fàvour of BNPP [France].
>
> We imperatively need these instructions to issue the pament [sic] guarantee on your behalf, otherwise we won't be in a position to move.

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 474 (2011)]

Accordingly, later that day, 13 July 2007, SMIL sent instructions ("the First Instructions") to BNPP Suisse to issue a first demand guarantee of $11,750,000.00 in favor of BNPP France with respect to the fulfillment of the First Oil Contract. The First Instructions stated: "[Bronwen] has a financing facility for principal amount of $100,000,000 USD which has been granted by [BNPP France] pursuant to an agreement dated dated [sic] 13 December 2006 (the 'Credit Facility'). SMIL has a business relationship with [Bronwen] pursuant to a separate agreement, a true and correct copy of which is attached hereto as Exhibit A, and which is incorporated herein by reference. The Guarantee is to be issued solely with respect to any amounts drawn by [Bronwen] pursuant to the Credit Facility in [Bronwen's] fulfillment of Exhibit A. SMIL will maintain a sufficient amount in its account with [BNPP Suisse] to satisfy the Guarantee." Exhibit A was a copy of the First Oil Contract executed the day before on 12 July 2007.

After SMIL sent the First Instructions to BNPP Suisse, but still on 13 July 2007, SMIL and Bronwen entered into an amended oil contract ("Amended Oil Contract"), which, by its terms, "supersede[d]" the First Oil Contract executed the previous day. The Amended Oil Contract reduced to $11,750,000.00 the amount guaranteed by SMIL to BNPP France for Bronwen's benefit. Like the First Oil Contract, it provided that the guaranteed amount would be maintained in SMIL's account with BNPP Suisse, and it again stated: "All litigation arising from or related to this agreement shall be heard exclusive [sic] in the state or federal courts sitting in Mecklenburg County, North Carolina, USA. Bronwen hereby irrevocably consents to personal jurisdiction [in] such courts."

Three days later, on 16 July 2007, BNPP Suisse acknowledged receipt of the First Instructions, but it informed SMIL that it "need[ed] a request with the actual wording of the guarantee" BNPP Suisse was to issue to BNPP France, as opposed to the more general wording of the First Instructions. BNPP Suisse included a draft of a first demand guarantee for SMIL's review. In addition to referencing the purchase by Bronwen of 80,000 metric tons of Jet A-1, as governed by the First Oil Contract and the Amended Oil Contract, the draft also referred to a purchase of 60,000 metric tons of Gasoil from KPC. The last line of the first demand guarantee stated: "This guarantee is subject to Swiss Law, place of jurisdiction is Geneva."

Later that day, SMIL emailed BNPP Suisse a revised version of the first demand guarantee. The revised version was substantially similar

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 474 (2011)]

to BNPP Suisse's draft. It confirmed that SMIL agreed to be responsible for Bronwen's repayment of the $11,750,000.00 credit issued to KPC, pursuant to the Amended Oil Contract, and it included the Geneva forum selection clause. It deleted the reference to the 60,000 metric tons of Gasoil that was not part of the Amended Oil Contract. SMIL's president, Mr. Brooks, signed the document after adding the following sentence: "All claims are to be sent to my attention at [Mr. Brooks' email address], and by fax to [a Charlotte, North Carolina fax number]." SMIL also noted in its email attaching the revised "guarantee form" that it had also attached "a superseding agreement [the Amended Oil Contract] between [SMIL] and [Bronwen] that is to be used in substitution for the Exhibit A [SMIL] originally sent to [BNPP Suisse]."

On appeal, the parties do not agree on the purpose or effect of the 16 July 2007 draft first demand guarantee sent by SMIL to BNPP Suisse. BNPP Suisse refers to the document as an actual guarantee by SMIL in favor of BNPP Suisse. SMIL insists that this draft of the first demand guarantee was merely an "Approval Document" that was approving the form of the first demand guarantee BNPP Suisse was going to send to BNPP France. SMIL contends that this Approval Document, which contained the Geneva forum selection clause, was not intended to supersede the First Instructions, which—SMIL argues —had the effect of incorporating by reference the North Carolina forum selection clause contained in the Bronwen contracts. In SMIL's complaint, however, SMIL referred to the 16 July 2007 document as a "supplemental guarantee."

Meanwhile, also on 16 July 2007 (but apparently before BNPP Suisse received SMIL's response with the revised version of the first demand guarantee), BNPP Suisse went ahead and issued a first demand guarantee to BNPP France by which BNPP Suisse promised that it would be responsible for Bronwen's repayment of the letters of credit to BNPP France. The first demand guarantee referenced both the 80,000 metric tons of Jet A-1 and the 60,000 metric tons of Gasoil, and it contained the Geneva forum selection clause.

Subsequently, on 19 July 2007, Bronwen and SMIL entered into a second oil contract ("the Second Oil Contract"). Under the Second Oil Contract, SMIL agreed to provide a first demand guarantee to BNPP France for an additional $4,000,000.00 to allow Bronwen to secure letters of credit to effectuate the purchase of 68,000 metric tons of Gasoil. Like the First and Amended Oil Contracts, it provided that the

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 474 (2011)]

guaranteed amount would be maintained in SMIL's account with BNPP Suisse, and it stated: "All litigation arising from or related to this agreement shall be heard exclusively in the state or federal courts sitting in Mecklenburg County, North Carolina, USA. Bronwen hereby irrevocably consents to personal jurisdiction in such courts."

On 23 July 2007, pursuant to the Second Oil Contract, SMIL sent BNPP Suisse new instructions ("the Second Instructions") directing BNPP Suisse to increase the amount of the first demand guarantee in favor of BNPP France by $4,000,000.00, bringing the total amount to $15,750,000.00. The Second Instructions stated: "SMIL has new business with [Bronwen] pursuant to a separate agreement [the Second Oil Contract], a true and correct copy of which is attached hereto as Exhibit A, and which is incorporated herein by reference. The additional $4,000,000 of the Guarantee is to be issued solely with respect to any amounts drawn by [Bronwen] pursuant to the Credit Facility in [Bronwen's] fulfillment of Exhibit A."

Approximately two weeks later, on 7 September 2007, Bronwen and SMIL entered into yet another contract ("the Third Oil Contract"). Under the Third Oil Contract, SMIL agreed to provide a first demand guarantee to BNPP France in the amount of $12,000,000.00 to allow Bronwen to secure letters of credit to effectuate the purchase of three shipments of 65,000 metric tons of Gasoil each. Like the previous Oil Contracts, the Third Oil Contract provided that the guaranteed amount would be maintained in SMIL's account with BNPP Suisse, and it stated: "All litigation arising from or related to this agreement shall be heard exclusively in the state or federal courts sitting in Mecklenburg County, North Carolina, USA. Bronwen hereby irrevocably consents to personal jurisdiction in such courts."

The same day, SMIL sent BNPP Suisse instructions ("the Third Instructions") directing BNPP Suisse to reduce the amount of the first demand guarantee to $12,000,000.00. The Third Instructions stated: "SMIL has new business with [Bronwen] pursuant to a separate agreement [the Third Oil Contract], a true and correct copy of which is attached hereto as Exhibit A, and which is incorporated herein by reference. The $12,000,000 Guarantee is to be issued solely with respect to any amounts drawn by [Bronwen] pursuant to the Credit Facility in [Bronwen's] fulfillment of Exhibit A."

A week later, on 14 September 2007, SMIL sent BNPP Suisse "updated" instructions ("the Fourth Instructions"). The Fourth Instructions reiterated the $12,000,000.00 amount of the first demand

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 474 (2011)]

guarantee and stated: "This Guarantee will cover all current business SMIL has with [Bronwen] pursuant to separate agreements [the Amended, Second, and Third Oil Contracts], true and correct copies of which are attached hereto as Exhibit A, and which are incorporated herein by reference. The $12,000,000 Guarantee is to be issued solely with respect to any amounts drawn by [Bronwen] pursuant to the Credit Facility in [Bronwen's] fulfillment of the contracts attached as Exhibit A."

In early November 2007, BNPP France determined that losses related to the Oil Contracts exceeded $17,000,000.00. BNPP France notified Bronwen and SMIL that BNPP France believed it had a right to draw on SMIL's account to cover its losses. SMIL disputed this claim, reminding BNPP France that the first demand guarantee only covered letters of credit issued to effectuate purchase of oil under the Oil Contracts and insisting that Bronwen's debt was not related to the purchase price of oil under the pertinent Oil Contracts. Because BNPP France nonetheless maintained that it had a right to draw on the first demand guarantee, SMIL announced on 6 November 2007 that it was terminating the first demand guarantee. The next day, however, BNPP Suisse notified SMIL that it had received a demand from BNPP France. Despite SMIL's protest, BNPP Suisse paid BNPP France $12,000,000.00 on 9 November 2007 and immediately debited SMIL's account for that amount.

SMIL filed a complaint on 22 April 2008, an amended complaint on 29 May 2008, and a second amended complaint on 25 September 2008, asserting claims for, *inter alia,* breach of contract against Bronwen and Swift; wrongful honor against BNPP Suisse; fraud and negligent misrepresentation against BNPP France; breach of demand guarantee and conversion against BNPP Suisse and BNPP France; equitable subrogation to BNPP France's claims against Bronwen and Swift; and unfair and deceptive trade practices against all defendants. SMIL also asserted that it was entitled to an accounting from all defendants. With respect to personal jurisdiction, SMIL alleged that Bronwen, Swift, BNPP France, and BNPP Suisse had all "agreed in their contracts with SMIL to the jurisdiction of this [North Carolina] Court to resolve all disputes."

On 4 August 2008, BNPP Suisse moved to dismiss SMIL's claims against BNPP Suisse for lack of personal jurisdiction pursuant to Rule 12(b)(2). The Business Court denied BNPP Suisse's motion in an order entered 14 July 2009. The court's order contained no findings of

fact, stating only: "After considering the Court file, the written Motion, the briefs of the parties, and the arguments of counsel, the Court DENIES the Motion." BNPP Suisse timely appealed from the order to this Court.

## Discussion

[1] On appeal, BNPP Suisse contends that the trial court erred in denying its motion to dismiss for lack of personal jurisdiction. Although the order denying the motion to dismiss is an interlocutory order, BNPP Suisse's appeal of the trial court's Rule 12(b)(2) decision is proper under N.C. Gen. Stat. § 1-277(b) (2009). *See Love v. Moore*, 305 N.C. 575, 581, 291 S.E.2d 141, 146 (1982) ("[T]he right of immediate appeal of an adverse ruling as to jurisdiction over the person, under [N.C. Gen. Stat. § 1-277(b)], is limited to rulings on 'minimum contacts' questions, the subject matter of Rule 12(b)(2).").

"Generally, determining whether a court can exercise personal jurisdiction over a nonresident defendant necessitates the implementation of a two-step inquiry: (1) Does a North Carolina statute authorize the court to entertain an action against that defendant; and (2) If so, does the defendant have sufficient minimum contacts with the state so that considering the action does not conflict with 'traditional notions of fair play and substantial justice.' " *Montgomery v. Montgomery*, 110 N.C. App. 234, 237, 429 S.E.2d 438, 440 (1993) (quoting *Johnston County v. R.N. Rouse & Co.*, 331 N.C. 88, 95-96, 414 S.E.2d 30, 35 (1992)). The burden is on the plaintiff to establish that some ground exists for the exercise of personal jurisdiction over the defendant. *Jaeger v. Applied Analytical Indus. Deutschland GMBH*, 159 N.C. App. 167, 170, 582 S.E.2d 640, 643-44 (2003).

"When this Court reviews a decision as to personal jurisdiction, it considers only 'whether the findings of fact by the trial court are supported by competent evidence in the record; if so, this Court must affirm the order of the trial court.' " *Banc of Am. Secs. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 694, 611 S.E.2d 179, 183 (2005) (quoting *Replacements, Ltd. v. MidweSterling*, 133 N.C. App. 139, 140-41, 515 S.E.2d 46, 48 (1999)). Under Rule 52(a)(2) of the Rules of Civil Procedure, the trial court is not, however, required to make specific findings of fact unless requested by a party. *Banc of Am. Secs.*, 169 N.C. App. at 694, 611 S.E.2d at 183. When, as in this case, the order contains no findings of fact, " '[i]t is presumed . . . that the court on proper evidence found facts to support its judgment.' "

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 474 (2011)]

*Id.* (quoting *Fungaroli v. Fungaroli*, 51 N.C. App. 363, 367, 276 S.E.2d 521, 524, *disc. review denied*, 303 N.C. 314, 281 S.E.2d 651 (1981)).

I

[2] SMIL first contends that the trial court's decision denying BNPP Suisse's motion to dismiss may be upheld on the grounds that BNPP Suisse consented to personal jurisdiction in North Carolina. As this Court has recognized, "[o]ne means by which a party may consent to personal jurisdiction, encountered most often in the commercial context, is a forum selection provision in a contractual agreement." *Montgomery*, 110 N.C. App. at 238, 429 S.E.2d at 441. When a party has consented to jurisdiction through a forum selection clause, the courts need not consider the applicability of the State's long-arm statute or whether minimum contacts exist. *Id.* at 237, 429 S.E.2d at 440.

In support of its contention that BNPP Suisse agreed to jurisdiction in North Carolina, SMIL points to the Instructions it sent to BNPP Suisse that both SMIL and BNPP Suisse agree are part of their contractual relationship. The Fourth Instructions—which, on 7 November 2007, SMIL described as the "currently operative" Instructions—state: "This Guarantee will cover all current business SMIL has with [Bronwen] pursuant to separate agreements, true and correct copies of which are attached hereto as Exhibit A, and which are *incorporated herein by reference.*" (Emphasis added.) SMIL argues that the Instructions' incorporation by reference of the Oil Contracts, each of which contained a North Carolina forum selection clause, effectively incorporated into the Instructions that forum selection clause, resulting in an agreement by BNPP Suisse to litigate "in the state or federal courts sitting in Mecklenburg County, North Carolina." BNPP Suisse, on the other hand, contends that the incorporation by reference clause was included in the Instructions "solely to identify the specific transactions covered by the Demand Guarantee."

It is well established that "[w]hen a contract is in writing and free from any ambiguity which would require resort to extrinsic evidence, or the consideration of disputed fact, the intention of the parties is a question of law." *Lane v. Scarborough*, 284 N.C. 407, 410, 200 S.E.2d 622, 624 (1973). "If the contract is ambiguous, however, interpretation is a question of fact, and resort to extrinsic evidence is necessary." *Crider v. Jones Island Club, Inc.*, 147 N.C. App. 262, 266-67, 554 S.E.2d 863, 866 (2001) (internal citation omitted), *cert. denied*, 356 N.C. 161, 568 S.E.2d 192 (2002).

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 474 (2011)]

SMIL relies on *Booker v. Everhart*, 294 N.C. 146, 152, 240 S.E.2d 360, 363 (1978), in which our Supreme Court held that "[t]o incorporate a separate document by reference is to declare that the former document shall be taken as part of the document in which the declaration is made, as much as if it were set out at length therein." SMIL points to the fact that, in *Booker*, the Court held that a promissory note was not a negotiable instrument because it incorporated by reference the terms of a deed of separation and property settlement and, thereby, "the parties made the note 'subject to' any and all possible conditions contained in those prior documents." *Id.* SMIL contends that, in this case, the Instructions' incorporation by reference of the Oil Contracts should, therefore, have made BNPP Suisse subject to the forum selection clause in the Oil Contracts.

SMIL has, however, overlooked the fact that the promissory note in *Booker* expressly incorporated "the terms" of the underlying agreements. The Supreme Court, which was applying N.C. Gen. Stat. § 25-3-105, stressed: "[I]t is clear that mere reference in a note to the separate agreement or document out of which the note arises does not affect the negotiability of the note. But to go beyond a reference to the separate agreement, by incorporating the terms of that agreement into the note, makes the note 'subject to or governed by' that agreement, and thus, under G.S. 25-3-105(2)(a), renders the promise conditional and the note nonnegotiable." *Booker*, 294 N.C. at 153, 240 S.E.2d at 364.

More recently, in *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs.*, 362 N.C. 269, 658 S.E.2d 918 (2008), our Supreme Court applied *Booker's* principles regarding incorporation by reference in addressing whether a party was bound by an indemnification provision. While the prime contract with respect to a construction project included an indemnification provision, the subprime agreement did not. As the Court noted, however, "[t]he Subprime Agreement at issue . . . incorporate[d] by reference terms of the Prime Agreement." *Schenkel & Shultz*, 362 N.C. at 273, 658 S.E.2d at 921. After quoting *Booker's* principle that incorporating a document by reference makes it part of the subsequent document " 'as much as if it were set out at length therein,' " *Schenkel & Shultz*, 362 N.C. at 273, 658 S.E.2d at 922 (quoting *Booker*, 294 N.C. at 152, 240 S.E.2d at 363), the Supreme Court nonetheless concluded, given the precise language, that an ambiguity still arose regarding "the intended scope of the reference in the Subprime Agreement to the Prime Agreement" and "[w]hether or not the parties intended to incorporate the express indemnification

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 474 (2011)]

provision of the Prime Agreement" when incorporating the Prime Agreement into the Subprime Agreement. *Id.* at 275, 658 S.E.2d at 922.

In sum, *Booker* provides that if a document incorporates a second document by reference, it effectively makes that second document part of the first without taking the time and space to set out the second document word for word. As *Schenkel & Shultz* demonstrates, however, a question still remains as to what the parties intended when they incorporated the second document.

Binding the parties to a provision in the incorporated document is only one possible result, as in *Elec-Trol, Inc. v. C. J. Kern Contractors, Inc.*, 54 N.C. App. 626, 628, 284 S.E.2d 119, 120 (1981) (enforcing as to subcontractor dispute resolution provision contained in general contractor's contract with owner because general contractor's contract with owner was incorporated by reference in subcontract), *disc. review denied*, 305 N.C. 298, 290 S.E.2d 701 (1982). For example, when a trial court incorporates by reference another document into an order, the intent of the trial court will not necessarily be to adopt all the contents of that document as binding. Rather, it may simply be using incorporation by reference to avoid having to summarize the contents of a piece of evidence on which it was relying when making its findings. *See, e.g., In re A.S.*, 190 N.C. App. 679, 693-94, 661 S.E.2d 313, 322 (2008) ("In this case, the trial court did not err when, while summarizing the evidence considered by the court, it incorporated the DSS and GAL reports by reference rather than specifically describing the content of those reports."), *aff'd per curiam*, 363 N.C. 254, 675 S.E.2d 361 (2009); *In re M.R.D.C.*, 166 N.C. App. 693, 698, 603 S.E.2d 890, 893 (2004) (explaining that "although the trial court may properly incorporate various reports into its order, it may not use these as a substitute for its own independent review"), *disc. review denied*, 359 N.C. 321, 611 S.E.2d 413 (2005); *In re A.E.*, 193 N.C. App. 454, 667 S.E.2d 340, 2008 WL 4635387, *5, 2008 N.C. App. LEXIS 1823, *13 (Oct. 21, 2008) (unpublished) ("The trial court's incorporation of [the doctor's] report served the same purpose as if the court had summarized the contents of that report in order to describe the evidence before it—much like an order's summarizing what a witness testified.").

We do not believe that SMIL's interpretation of the "incorporation by reference" of the Oil Contracts is reasonable. In contrast to *Booker* and other decisions cited by SMIL, the Instructions do not incorporate the "terms" of the Oil Contracts, but rather the Instructions refer to the Oil Contracts as "separate agreements" that are generally incorpo-

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 474 (2011)]

rated: "This Guarantee will cover all current business SMIL has with [Bronwen] pursuant to separate agreements, true and correct copies of which are attached hereto as Exhibit A, and which are incorporated herein by reference."

This reference to "separate agreements" is consistent with the "independence principle," which is a fundamental aspect of letter of credit transactions such as this one: "It is emphasized by all the sources we have found that the basic aspect of the successful use of letters of credit lies in recognizing at the threshold that every letter of credit involves separate and distinct contracts; and that the contract between the issuing bank and the beneficiary to pay money to the beneficiary upon demand (and documentation if called for) *must be kept chaste [and] independent of the underlying contract* between the purchaser of the letter and the beneficiary." *Sunset Invs., Ltd. v. Sargent*, 52 N.C. App. 284, 288, 278 S.E.2d 558, 561 (emphasis added), *disc. review denied*, 303 N.C. 550, 281 S.E.2d 401 (1981). *See also* N.C. Gen. Stat. § 25-5-103(d) (2009) ("Rights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance, or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary.").

SMIL's proposed construction of the incorporation by reference language as making the terms of the underlying Oil Contracts binding on BNPP Suisse is not consistent with the Instructions' characterization of those contracts as "separate agreements." Nor is it consistent with the fundamental independence principle governing letter of credit transactions. Moreover, we cannot see how the terms of the Oil Contracts apart from the forum selection clause could be applicable to the relationship between SMIL and BNPP Suisse—yet, SMIL's proposed construction would nonetheless make those terms part of the contract between SMIL and BNPP Suisse.

Instead, the plain language of the Instructions indicates that the purpose of the incorporation by reference of the Oil Contracts is to specifically identify what contracts were being guaranteed by SMIL without having to set out the details of those contracts. This construction is supported by the sentence immediately following the incorporation by reference, which states: "The $12,000,000 Guarantee is to be issued solely with respect to any amounts drawn by

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 474 (2011)]

[Bronwen] pursuant to the Credit Facility in [Bronwen's] fulfillment of the contracts attached as Exhibit A."

We do not believe that the Instructions can be reasonably construed to make the forum selection clause in the underlying contracts binding on BNPP Suisse. Consequently, we cannot conclude that the " 'language of [the] contract is fairly and reasonably susceptible to . . . the construction[] asserted by' " SMIL. *Barrett Kays & Assocs. v. Colonial Bldg. Co., Inc. of Raleigh*, 129 N.C. App. 525, 528, 500 S.E.2d 108, 111 (1998) (quoting *Bicket v. McLean Secs., Inc.*, 124 N.C. App. 548, 553, 478 S.E.2d 518, 521 (1996), *disc. review denied*, 346 N.C. 275, 487 S.E.2d 538 (1997)). The Instructions are, therefore, not ambiguous and must be enforced in accordance with their plain language. *Id.*

Even if we could find the language ambiguous, SMIL has overlooked "[o]ne of the most fundamental principles of contract interpretation"—that "ambiguities are to be construed against the party who prepared the writing." *Chavis v. Southern Life Ins. Co.*, 318 N.C. 259, 262, 347 S.E.2d 425, 427 (1986). This Court has stressed that "[b]efore this rule of construction should be applied, the record should affirmatively show that the form of expression in words was actually chosen by one [party] rather than by the other." *Joyner v. Adams*, 87 N.C. App. 570, 577, 361 S.E.2d 902, 906 (1987) (internal quotation marks omitted) (holding that rule did not apply when record showed that sophisticated parties engaged in protracted negotiation process in which language was assented to by both parties who each had knowledge to understand language and bargaining power to alter it).[1]

Here, SMIL was responsible for the language of the Instructions. BNPP Suisse did not participate in any negotiations regarding the specific language used in the Instructions—SMIL chose the incorporation by reference language on its own. Accordingly, under *Joyner*, any ambiguity regarding the intent of the incorporation by reference clause—including whether it was intended to make the choice of forum clause binding on BNPP Suisse—must be construed against SMIL and in favor of BNPP Suisse. Consequently, the Instructions must be read as simply referring to the Oil Contracts rather than

---

1. This Court explained that "[t]he rule is essentially one of legal effect, of construction rather than interpretation, since it can scarcely be said to be designed to ascertain the meanings attached by the parties." *Joyner*, 87 N.C. App. at 576, 361 S.E.2d at 905 (internal quotation marks omitted).

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 474 (2011)]

adopting as binding all the terms—including the North Carolina forum selection clause—contained therein. Thus, the trial court could not have properly concluded, as a basis for its denial of the motion to dismiss, that BNPP Suisse had consented to personal jurisdiction in North Carolina.

II

[3] Having determined that the evidence fails to support any finding that BNPP Suisse consented to personal jurisdiction, we turn to the question whether the evidence would permit a finding that personal jurisdiction over BNPP Suisse exists under North Carolina's long-arm statute and that BNPP Suisse has sufficient minimum contacts with North Carolina to satisfy the requirements of due process. At the outset of this analysis, we must address SMIL's assertion that "[a]lthough case law is mixed on this point, the weight of authority suggests that it is not necessary to separately evaluate whether jurisdiction is authorized by the long-arm statute[.]"

SMIL is correct in noting that this Court has previously generally described the long-arm statute analysis as collapsing into the minimum contacts analysis. *See, e.g., Lang v. Lang*, 157 N.C. App. 703, 708, 579 S.E.2d 919, 922 (2003) (" 'Since the North Carolina legislature designed the long-arm statute to extend personal jurisdiction to the limits permitted by due process, the two-step inquiry merges into one question: whether the exercise of jurisdiction comports with due process.' " (quoting *Regent Lighting Corp. v. Galaxy Elec. Mfg., Inc.*, 933 F. Supp. 507, 510 (M.D.N.C. 1996))).

More recently, however, our Supreme Court has emphasized that deciding a motion to dismiss based on Rule 12(b)(2) involves two separate steps of analysis: "To ascertain whether North Carolina may assert personal jurisdiction over a nonresident defendant, we employ a two-step analysis. Jurisdiction over the action must *first* be authorized by N.C.G.S. § 1-75.4. *Second, if* the long-arm statute permits consideration of the action, exercise of jurisdiction must not violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Brown v. Ellis*, 363 N.C. 360, 363, 678 S.E.2d 222, 223 (2009) (emphasis added) (internal citations and quotation marks omitted). We "are bound to follow" the framework laid out by the Supreme Court and, accordingly, we apply the two-step analysis. *State v. Parker*, 140 N.C. App. 169, 172, 539 S.E.2d 656, 659 (2000), *appeal dismissed and disc. review denied*, 353 N.C. 394, 547 S.E.2d 37, *cert. denied*, 532 U.S. 1032, 149 L. Ed. 2d 777, 121 S. Ct. 1987 (2001).

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 474 (2011)]

With respect to the long-arm statute, we are mindful that its provisions "should be liberally construed in favor of finding personal jurisdiction." *Fungaroli*, 51 N.C. App. at 365, 276 S.E.2d at 522. "[I]f the evidence supports a finding which comports with one of the [statute's] provisions, jurisdiction will follow under the long-arm statute." *Dataflow Cos. v. Hutto*, 114 N.C. App. 209, 212, 441 S.E.2d 580, 582 (1994). If, however, "there is *no* evidence to support an essential finding of fact," no jurisdiction exists. *Spivey v. Porter*, 65 N.C. App. 818, 819, 310 S.E.2d 369, 370 (1984).

The only statutory basis for jurisdiction asserted by SMIL is N.C. Gen. Stat. § 1-75.4(4)(a) (2009), which provides for personal jurisdiction when the plaintiff claims an injury "within this State arising out of an act or omission outside this State by the defendant, provided in addition that at or about the time of the injury . . . [s]olicitation or services activities were carried on within this State by or on behalf of the defendant[.]" In order for N.C. Gen. Stat. § 1-75.4(4)(a) to apply, a plaintiff "must establish: 1) an action claiming injury to a North Carolina person or property; 2) that the alleged injury arose from activities by the defendant outside of North Carolina; and 3) that the defendant was engaging in solicitation or services within North Carolina 'at or about the time of the injury.' " *Fran's Pecans, Inc. v. Greene*, 134 N.C. App. 110, 113, 516 S.E.2d 647, 649-50 (1999) (quoting N.C. Gen. Stat. § 1-75.4(4)(a)). SMIL argues that § 1-75.4(4)(a) applies "because there is a foreign act causing a local injury to SMIL (which is headquartered in Charlotte) and [BNPP] Suisse was conducting solicitation activities, namely [1] soliciting the instructions from SMIL and [2] advertising at the Davis Cup tournaments in Winston-Salem."

The key question here is whether, as a matter of law, the evidence of BNPP Suisse's conduct constitutes "solicitation" under § 1-75.4(4)(a). The evidence in the record shows that SMIL opened an account with BNPP Suisse in 2006 to facilitate its business of engaging in petroleum products transactions. With respect to the series of transactions at issue, Mr. Brooks' affidavit reveals that he personally emailed a copy of the Corporate Guarantee to BNPP Suisse *first*. Only *after* receiving the Corporate Guarantee from SMIL did BNPP Suisse contact SMIL to relay the request that SMIL should instead issue instructions to BNPP Suisse that would govern a guarantee to be issued by BNPP Suisse to BNPP France, as required by BNPP France. SMIL fails to explain how BNPP Suisse's response to an email from an existing customer to effectuate a business transaction

between the customer and a third party, BNPP France, amounts to solicitation of SMIL's business.

Moreover, although SMIL alleged that it would not have issued the Instructions "but for [BNPP Suisse's] solicitation," the evidence shows that the request for instructions originated from BNPP France as the precondition for BNPP France's financing of the Bronwen contracts. Under the Oil Contracts, SMIL was obligated to maintain "[t]he funded amount guaranteed . . . in SMIL's account with [BNPP Suisse]" and to "execute such document(s) as reasonably required by [BNPP France] to effectuate the guarantee of the funded amount." Thus, contrary to the contentions on appeal, SMIL's transaction with BNPP Suisse was the result not of any solicitation by BNPP Suisse, but rather was the consequence of provisions in the Oil Contracts. The evidence does not, therefore, support any contention that the request for instructions constituted a solicitation in North Carolina by BNPP Suisse at or near the time of SMIL's injury.

SMIL points to *Brown*, 363 N.C. at 363-64, 678 S.E.2d at 224, in which the Supreme Court held that the plaintiff, who claimed alienation of affection, had alleged facts sufficient to authorize the exercise of personal jurisdiction over the nonresident defendant pursuant to N.C. Gen. Stat. § 1-75.4(4)(a) when the plaintiff's complaint alleged that the defendant " 'initiat[ed]' " the calls and emails at issue. Here, however, SMIL cites to no evidence showing BNPP Suisse ever initiated any business relationship or transaction with SMIL. *See Tutterrow v. Leach*, 107 N.C. App. 703, 709, 421 S.E.2d 816, 820 (1992) ("The record reflects that defendants never solicited their business within North Carolina; in fact, plaintiff Tutterrow was the first to initiate any contact with defendants."), *appeal dismissed*, 333 N.C. 466, 428 S.E.2d 185 (1993).

Next, as to the alleged advertising by BNPP Suisse, SMIL has failed to cite to evidence showing such advertising is attributable to any company aside from BNPP Suisse's parent company, BNPP France. There is no question that BNPP France sponsored the Davis Cup, an international tennis competition. The record provides abundant evidence of BNPP France's advertising in 2007 and 2008 at Davis Cup quarterfinal matches in Winston-Salem, North Carolina, including photographs of the BNP Paribas logo on structures at the events and copies of Davis Cup programs containing the logo. There is no evidence, however, that BNPP Suisse, an entirely separate corporate entity, sponsored anything in Winston-Salem.

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 474 (2011)]

SMIL argues that BNPP Suisse, as part of the BNP Paribas "group," should be subject to North Carolina jurisdiction because BNPP Suisse benefitted from the advertising at the Davis Cup. According to Mr. Brooks' affidavit, in Davis Cup programs, "the name 'BNP Paribas' is not targeted to a specific entity. Rather, it *appears* to apply to all entities within the larger overall BNP Paribas corporate group, including" BNPP Suisse. (Emphasis added.) SMIL also emphasizes on appeal that the BNP Paribas logo "features the most prominent part of [BNPP Suisse's] name." Yet SMIL cites no authority that would subject a subsidiary called "BNP Paribas (Suisse)" to personal jurisdiction in this State simply because a parent company called "BNP Paribas" advertised here using its *own* name, simply on the grounds that the names are similar.

Mr. Brooks' affidavit also directs the reader to a "Sponsoring" tab on the BNPP Suisse website. Clicking on that tab redirects the Internet user to the BNPP France website's tennis page. If the Internet user then clicks on the Davis Cup link on that BNPP France page, he or she is then taken to information about the Davis Cup and the fact that "BNP Paribas is the 'Official Sponsor of the Davis Cup' as well as the 'title sponsor.'" Mr. Brooks' repeated identification of the Davis Cup page on the BNPP France website as "[t]he [BNPP] Suisse Davis Cup Page" is an unsupported stretch.[2] The mere fact— and SMIL offers nothing more—that an Internet user clicking on a series of links starting at the BNPP Suisse page eventually ends up at the BNPP France page regarding BNPP France's sponsorship of the Davis Cup, which happened to hold matches in Winston-Salem, does not establish that BNPP Suisse engaged in advertising in North Carolina.

We cannot impute the actions of BNPP France to BNPP Suisse for purposes of personal jurisdiction without proof that the banks are part of the same whole and were not acting independently. In *Wyatt v. Walt Disney World Co.*, 151 N.C. App. 158, 168, 565 S.E.2d 705, 711 (2002), the plaintiffs similarly "assert[ed] a general relationship among various commercial enterprises with some connection to WDWCO [the defendant Walt Disney World Company]. . . . In effect, plaintiffs invite[d] this Court to treat the entire 'Disney empire,' and

---

2. While SMIL argues vigorously that this Court must accept SMIL's affidavits as true, including all statements in those affidavits, our standard of review does not require that we accept a witness' characterization of what "the facts" mean. Nor are we required to accept as facts statements not based on personal knowledge, such as those asserted by Mr. Brooks in his supplemental affidavit.

all who profit from the existence of WDWCO, as one entity for purposes of personal jurisdiction." This Court rejected that invitation, explaining that the Court "may not do so absent proof that the businesses are parts of the same whole." *Id. See also Ash v. Burnham Corp.*, 80 N.C. App. 459, 462, 343 S.E.2d 2, 4 ("There is no evidence that [defendant] and the subsidiary are not separate and independent, and we thus determine that the subsidiary's presence in this state is not to be considered as a basis for asserting jurisdiction over [defendant]."), *aff'd per curiam*, 318 N.C. 504, 349 S.E.2d 579 (1986).

Because SMIL has not made the showing required by *Wyatt* and *Ash* that would support treating BNPP France and BNPP Suisse collectively for purposes of the long-arm statute, we conclude that none of the evidence cited by SMIL constitutes solicitation for purposes of bringing BNPP Suisse within N.C. Gen. Stat. § 1-75.4(4)(a). Since SMIL has failed to establish a basis under the long-arm statute for North Carolina's courts asserting jurisdiction over BNPP Suisse, we need not address whether exercising jurisdiction over BNPP Suisse would satisfy the requirements of due process under the Fourteenth Amendment. We hold that the trial court erred in concluding that it has personal jurisdiction over BNPP Suisse and, therefore, reverse.

Reversed.

Judges ROBERT C. HUNTER and STEPHENS concur.